IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:04-CR-169 |
| | ) | (JORDAN/SHIRLEY) |
| LEONARDO REYES, ONIDES REYES, | ) | |
| and ALBERTO SUAREZ, | ) | |
| | ) | |
| Defendants. | ) | |

## **REPORT AND RECOMMENDATION**

This matter comes before the Court upon the defendants' Joint Motion to

Suppress [Doc. 15]. The government filed a response to the Motion [Doc. 17]. The parties came

before the Court for a suppression hearing on February 14, 2005. The government was

represented by Assistant United States Attorney Matthew Morris and the defendant, Leonardo

Reyes was represented by attorney Bruce Poston, defendant Onides Reyes was represented by

attorney Robert Jolley, defendant Alberto Suarez was represented by attorney Mike Whalen.

The defendants were also present. The Court notes that both the original motion and the

response were only one and one-half pages long and that a full understanding of the issues

involved only came about through the suppression hearing. Further, in closing statements

Assistant United States Attorney Morris indicated he would be filing a post hearing brief for the

benefit of the Court. Thereafter, the government filed an anticipated supplemental response

[Doc. 32] on March 17, 2005, in which it also raised for the first time the issue of the executing

officer acting in good faith. The defendants never filed a supplemental response. Thereafter, the

Court took the suppression motion and related filings under advisement.

# I.  POSITIONS OF THE PARTIES

The defendants' Joint Motion to Suppress [Doc. 15] requests the Court to suppress "any and all evidence obtained as a result of the illegal seizure and questioning of the defendants and the search of the truck they were driving at the time of their seizure at the Georgia Welcome Center on Interstate 75 in Catoosa County, Georgia on or about April 21, 2003."  Defendants aver that their Fourth Amendment and Fifth Amendment Rights were violated.  They specifically allege that they were seized on April 21, 2003, and subjected to improper questioning without benefit of <u>Miranda</u> warnings and that such questioning lead to the discovery of certain evidence against them. Further, they contend that their property was subjected to a search and seizure and that the search warrant issued in this case was based on a statement of a "reliable confidential source" and that such statement, and the reasonableness of such search, is unknown to the defendants.

The government's initial Response [Doc. 17] contends that upon the defendants' arrest, that they were advised of their Miranda rights and that the government is not aware of any statement or admissions given by the defendants other than answers to general requests for identifying information for booking purposes.  The government does note that defendant Leonardo Reyes voluntarily produced a pair of bolt cutters from the cab of the 1994 Freightliner Tractor, a vehicle in which the defendants had been traveling when they arrived at the Georgia Welcome Center.  The government also notes that a state search warrant was obtained for the search of the cab of the 1994 Freightliner and contends that a copy of that search warrant and the affidavit in support of the search warrant had been provided to the defendants in discovery.  The government also contends that the defendants know that the reliable confidential informant was Louise Richards and

that her name is specifically noted in the Affidavit and her statement was summarized in the incident report and contained in the Affidavit in support of the search warrant.

In its Supplemental Response to the Joint Motion to Suppress [Doc. 32], filed after the suppression hearing, the government accurately refers to the defendants initial motion as a "bare bones" motion. The government notes that on April 19, 2003, the sheriff's office in Catoosa County, Georgia, responded to a 911 call from Louise Richards, who professed to be an eyewitness who became concerned when she observed a Landstar trailer which she observed "had been 'dropped' at the Welcome Center parking lot without a lock on the kingpin of the trailer." The government also notes that Ms. Richards observed a tractor-trailer bearing the name of Eleicy Transportation enter the Welcome Center and park next to the Landstar trailer. Thereafter, Ms. Richards observed the defendants in the cab of such tractor and them observed one of the defendants walk to the rear of the Landstar trailer with a pair of bolt cutters, following which she called 911.

The government further contends that deputy Roden arrived at the scene, spoke with Ms. Richards and obtained her statement and that she showed him the bolt seal that had been cut off the Landstar trailer. Deputy Roden further observed one of the three defendants backing the Eleicy Transportation tractor up to a trailer on the north side of the Landstar trailer and that he stopped the driver from backing up and asked him to shut the motor off and step down from the tractor. The defendants' were patted down for weapons and asked to sit on the ground next to the trailer but were not handcuffed. A fourth individual was also summoned to the scene. Another deputy, Kenneth Hooten, asked for the identifications from the four men and began checking for outstanding warrants against them. Deputy Roden then went to the rear of the Landstar trailer with Ms. Richards and observed (on the ground) a bifold tag from a set of "taskforce 18" bolt cutters and observed that the

3

Landstar trailer was not sealed. According to Deputy Roden, Ms. Richards had found pieces of the bolt seal that had been cut off the stolen trailer's doors. Deputy Roden returned to the four males and determined that Leonardo Reyes had been driving the Eleicy Transportation tractor trailer, whereupon he took Mr. Reyes back to the rear of the stolen trailer to look at the bifold tag on the ground. Deputy Roden then asked Leonardo Reyes if he had bolt cutters with him. Leonardo Reyes acknowledged that he did have bolt cutters in his truck and voluntarily retrieved a pair of new 18-inch taskforce bolt cutters from the cab and handed them to him. Deputy Roden contends that although the bolt cutters matched the tag that he found at the rear of the stolen trailer, Mr. Reyes claimed that they were for the purpose of opening trailers that he hauled.

The government also notes that the following Monday, April 21, 2003, Detective Mike Tinker applied to the Magistrate Judge of Catoosa County, Georgia, for a search warrant to search the cab of the Eleicy Transportation cab and trailer. The affidavit and application for the search warrant were admitted as Government's Exhibit SH2. The government contends that the Affidavit of Detective Tinker explained that Ms. Richards had observed three Hispanic males in the vicinity of the Landstar trailer and that one of the them had walked to the rear of the trailer with a pair of bolt cutters and subsequently returned and placed them in the tractor that Detective Tinker was now seeking to search. The government contends that Detective Tinker further explained that the Landstar trailer had been stolen in Knox County, Tennessee, and that a number of similar stolen trailers had been recovered in Macon, Georgia. The government notes that the search warrant was issued by the Magistrate Judge and the tractor was searched and a number of items were recovered including a set of motorola hand-held walkie talkies, various log books, and a bill of lading from the stolen load.

4

The government argues that the temporary direction of the defendants and a fourth person vehicle to sit on the pavement at the Welcome Center and the showing of the defendant, Leonardo Reyes the tag from the bolt cutters lying on the ground, was not a hostile or coercive setting. Further the government notes that the questioning took place outside in a public place with others nearby and that the deputies were merely trying to assess a confusing situation. The government contends that the situation had not escalated to the point of formal arrest, even though the officers were receiving information strongly suggesting a crime had been committed and that the defendants were involved. The government contends that the fact the police later released a fourth individual further affirms that the initial questioning on the scene and the subsequent interviews were only investigatory in nature and not questions made after a formal arrest or in a coercive context akin to custody. The government cites Miranda and Sixth Circuit cases regarding the issuance of Miranda warnings and the non-application of Miranda warnings to Terry stops. The government also addresses issues regarding temporary detentions, not necessitating Miranda warnings prior to questioning.

With regard to the search warrant, the government notes that the defendants' complaint about the sufficiency of the search warrant is not specific or clear, but nonetheless, the government contends that a "four-corners analysis" of the search warrant indicates it was properly obtained and relied upon by law enforcement in this search. The government again references the affidavit and application in support of the warrant and cites Illinois v. Gates, 462 U.S. 213 (1983), regarding the probable cause requirement and the review associated with such warrants. The government contends that if the affiant's statements regarding the bolt cutters were "merely inaccurate" such erroneous assumptions in an affidavit from information an officer received does

5

not amount to reckless inclusion of false statements. The government also contends that the Affidavit contained more than sufficient information to establish probable cause based on Detective Tinker's explanation that an eyewitness had observed activity strongly indicating the defendants were engaged in criminal activity and that the Landstar trailer involved had previously been stolen and that the informant, Ms. Richards, had observed the defendants take bolt cutters to the rear of the trailer, which she observed was locked. The government also notes Ms. Richards was not an unnamed confidential informant but rather was an eyewitness to what appeared to be criminal conduct and her statements were corroborated by a determination that the Landstar trailer had been stolen. The government argues that eyewitness statements are generally entitled to a presumption of reliability and veracity. Finally, the government added the contention that the officers were acting in good faith and are entitled to assert the <u>Leon v. United States</u>, 468 U.S. 897, 926 (1984) exception.

## SUPPRESSION HEARING FACTS

At the suppression hearing, Deputy Roden testified that he was the first officer on the scene and met with a female complainant, who had indicated that she believed four Hispanics were breaking into a trailer and that one of them had bolt cutters. While he was speaking to her, he saw another tractor backing up to another trailer next to the trailer referenced by the complainant.

Deputy Roden said at that point, he instructed the three Hispanics in the tractor that was backing up to come over to his location and he got the attention of a fourth Hispanic male and had him to come over as well. Around that time, he indicated that Deputy Hooten also arrived and

6

that they were both trying to figure out "what we had." They next obtained identification from all four subjects and did a pat down for weapons. Deputy Roden indicated that he had them sit on the concrete curb to keep them from wandering around the parking lot. He stated that he then walked to the rear of the trailer where the complainant had said that a seal had been cut off the trailer and he observed that the seal had been cut and was not there. He also observed a "bifold tag" apparently from a certain brand name of bolt cutters. He then returned to where the four subjects and Deputy Hooten were located and ascertained who was driving the tractor that he had observed backing up. He indicated that at this point and time, the subjects were not in handcuffs and no weapons had been drawn. Once the driver of the tractor was identified, Deputy Roden took him to the rear of the trailer and showed him where the seal had been cut off and showed him the bifold tag on the ground and asked him if he had any bolt cutters. Deputy Roden indicated that this person said that he did and this same person went back to his tractor and got a pair of bolt cutters. Thereafter, he tried to ascertain from the four subjects information regarding what business they were on, where they were headed, etc., and he indicated that suddenly a language barrier developed between all the defendants and law enforcement. He said at that point, they were advised to take all the suspects to the sheriff's office for further interviews with a detective and that was done.

Deputy Roden testified on cross-examination by attorney Whalen that the initial call had come in around 1:10 p.m. on April 19, 2003, and that he had arrived a short time thereafter. He could not identify in Court who was actually driving the tractor he had seen backing up but did specifically identity defendant Leonardo Reyes as the person he took to the rear of the trailer. He also indicated that Mr. Reyes stated that the tractor was his. Deputy Roden also testified that he

asked the suspects if the trailer to which they were backing up was their trailer and that it was indicated that it was.

Deputy Roden stated that he first talked with the complainant and made his first contact with the defendants less than a few minutes later. As he approached them, he asked if they had any identification and took their identification. At the hearing, he could not recall if their identification consisted of their driver's licenses. He handed the identification documents to Deputy Hooten who ran the warrant check. He did concede that if the identification documents were driver's licenses that the defendants could not have left the scene "legally." He reiterated that after he and Officer Hooten obtained the identifications, they did a pat down and instructed all four suspects to sit down. He then stated that he went to the back of the trailer with the complainant, saw the tag on the ground and returned back to the subjects and Deputy Hooten, and ascertained that Mr. Leonardo Reyes was the driver and owner of the other tractor.

Deputy Roden confirmed that the complainant's call indicated that she thought that someone was breaking into a trailer and that when he looked at the back of the trailer, he did not see a lock or a seal. He also confirmed that when he went to talk to the suspects, he was investigating a burglary or a possible attempted burglary.

Deputy Roden confirmed that he did not read any of the subjects their Miranda rights while they were seated on the ground. He further admitted that they were seated on the ground at his request or order and that he had their identification documents. He also confirmed that he asked Mr. Reyes if he had bolt cutters and did not ask anyone else at the scene or otherwise, if they had bolt cutters. He did not know how long it was from the time he asked the subjects to sit down until he asked about the bolt cutters.

8

Deputy Roden asserted that although he asked Mr. Reyes if he had a set of bolt cutters, he did not ask Mr. Reyes to get them or give them to him. Rather, Mr. Reyes simply walked to the front of the trailer, went over to his tractor, and voluntarily obtained the bolt cutters on his own. Deputy Roden indicated that the bolt cutters were handed to him and he went to the rear of the trailer and compared them with the bifold tag, which was still lying on the ground. After that, he returned to the subjects and continued to try to talk to them but, at this point, encountered a language barrier and decided that the officers needed to confer with a deputy. The subjects were then taken to the Catoosa County Sheriff's Office, which involved less than ten minutes driving time. He conceded that at this point in time, all four were transported to the Sheriff's Office.

On further cross-examination by attorney Poston, Deputy Roden confirmed that the complainant had indicated that there were four people involved and that the fourth one had been walking away when Deputy Roden got his attention and simply asked him to come back to the location. Deputy Roden did concede that the fourth gentleman was not allowed to leave at that point. Deputy Roden also indicated that he did not obtain the search warrant in issue but that Detective Tinker did. He also confirmed that Detective Tinker later let the fourth subject go. However, he was not sure why Detective Tinker let him go. He was also unsure as to whether Deputy Hooten might have parked his car in front of the trailer. Deputy Roden confirmed that an NCIC check was conducted on the identifications and that during this time these four men were not free to leave. Deputy Roden indicated that they were sitting there until he and Officer Hooten could figure out what they actually had and what was going on.

Defense counsel pointed out that Deputy Roden had met with the Assistant United States Attorney prior to the hearing and had discussed this matter, the issues of custody and <u>Miranda</u>

9

rights and the reason for the defendants sitting down and then asked him if after reflection, that is

when he came up with the fact that they were put on the ground to keep them from walking around

in traffic for their own safety.  To that inquiry, Deputy Roden indicated that was correct.  He was

thereafter asked if they were in fact in detention and his answer was, "yes they were in investigative

detention."

He again confirmed that he knew the seal had been cut off the trailer and that these

were the only suspects in the criminal investigation and that he did not issue <u>Miranda</u> warnings to

them.  He again confirmed that while he asked Mr. Reyes if he had a set of bolt cutters, he did not

ask him were they where.

Deputy Roden confirmed that Detective Tinker arrived after he had left the scene and

had transported the subjects to the sheriff's officer.  He indicated that he believed the total elapsed

time between arrival and leaving the scene was about thirty minutes.  Finally, he reiterated that

Leonardo Reyes had identified himself as the driver of the tractor although Deputy Roden could not

actually identify him as the person he saw backing the tractor up.

On cross-examination by attorney Jolley, Deputy Roden confirmed that the female

complainant's statements were instrumental in determining who should be taken into custody and

that Deputy Roden did not know her and did not check her out or even ask for her identification.

He also did not know her occupation or why she was at the scene.  He confirmed that she told

Deputy Roden that she had seen three subject go to the rear of the trailer and that one had bolt

cutters and that this was inconsistent with a police report which indicates she saw one subject go to

the rear of the trailer.  He did confirm that it would not be accurate to say that she only saw one

Hispanic male go to the rear of the trailer based on what she had told him. He further confirmed that Ms. Richards was the source for the dispatch information.

He was then asked if upon arrival, he had taken the Hispanic males "into custody" and he confirmed that he did. He was asked when he had taken them into custody, and he stated that it was after speaking with the complainant. He did not know if truck drivers/haulers normally carry bolt cutters or if there were legitimate or illegitimate purposes for having them. He then indicated that Mr. Reyes actually made two statements, the first of which was that he had some bolt cutters. However, on cross-examination, he also indicated that Mr. Reyes said that he had used bolt cutters to cut seals off his own trailers.

When asked what information he relied upon in seizing these four Hispanic males, Deputy Roden indicated that their seizure was based upon information from Ms. Richards and her husband and the fact that the seal was found by Ms. Richards in the grassy area near the rear of the truck.

With regard to specificity concerning the conversation surrounding the bolt cutters, he indicated that Mr. Leonardo Reyes had accompanied him to the rear of the trailer, Mr. Reyes was shown the bifold tag, and he was asked if he had any bolt cutters by that name brand. At that juncture, Mr. Reyes said that he had bolt cutters. Mr. Reyes then walked back to his trailer, and Deputy Roden said that he followed. When Mr. Reyes got to the tractor, he got the bolt cutters out and handed them to Deputy Roden.

Deputy Roden testified that a third deputy arrived prior to them transporting the subjects to jail and confirmed that they were all carrying guns, batons, and pepper spray. He also admitted that when they patted the defendants down, they had no information that indicated that any

11

of them were carrying a weapon and no information regarding any actual need to pat them down. However, he indicated that it was standard procedure for officer safety. He did confirm that no weapons were found on the defendants. He was then asked questions regarding the tractor that was backing up when he arrived. He confirmed that the trailer to which it backed up was not the trailer in issue (i.e., the Landstar trailer), and was not the trailer that the government is claiming was stolen. He further confirmed that he never saw the defendants make any attempt to connect their tractor to the trailer in issue. He further confirmed that one might believe that they were getting ready to leave this location and if so, they were getting ready to leave without the Landstar trailer (the trailer in issue) that was parked next to them.

Deputy Roden could not testify as to how the tractor trailer was ultimately moved to another location or who drove it or hauled it over there, although he noted that the general procedure is to have it towed. There were also some questions regarding the opening of the door on the rear of the Landstar trailer and although he conceded that it was open before he left the scene, he did not know by whom. He also confirmed that the bifold tag said "Taskforce 18-inch bolt cutters" on it and that Mr. Reyes' bolt cutters matched the writing on the tag.

On redirect examination by Assistant United States Attorney Morris, Officer Roden confirmed that Leonardo Reyes had responded to his question about who was driving the truck in the affirmative and identified himself as the driver. Deputy Roden also confirmed that he had compared the writing on the tag and the bolt cutters and they appeared to be the same type of bolt cutters as identified on the bifold tag. He also confirmed that his training with regard to making an arrest indicates that it is dependent upon probable cause or the commission of offense in the presence of any officers. He indicated that the reason that these four individuals were seated on the

ground was for officer safety and indicated that he wanted to isolate them and prevent them from wandering off while conducting an investigation. He also confirmed that after these four suspects were detained, that the complainant, Ms. Richards, said that they were the subjects in question.

On recross-examination, he could not recall if the keys had been taken from the driver. He said that they were still investigating what was going on but that he would have had no reason to take the keys at that point because they were still investigating what was going on. He recalled that the tractor was not actually attached to the trailer when he initially saw it. Accordingly, he did not know who connected the tractor allegedly being driven by Mr. Reyes to the trailer to which he was backing up.

On further recross-examination by attorney Jolley, Deputy Roden confirmed that the complainant had only indicated to him that she saw the subjects go to the rear of the trailer with bolt cutters but she did not say what happened once they got to the rear of the trailer. He also pointed out that it was unlikely she could have seen what happened at the rear of the trailer.

Deputy Roden also confirmed that the subjects were handcuffed when they were placed in the patrol car and transported to the Sheriff's Office and that they were locked in the car. Deputy Roden was then asked about Onides Reyes being identified as one of the subjects in question. Deputy Roden indicated that he had been identified as the one who had gone to the rear of the truck and "possibly" cut the lock off the trailer. When asked whether he meant possibly or probably, Deputy Roden indicated possibly.

On further questioning regarding the requirement of probable or possible cause to take someone into custody, Deputy Roden indicated that there was probable cause to take them and to continue further investigation at the Sheriff's Office. He further indicated that Mr. Onides Reyes

13

had been taken to the Sheriff's Office for further interviews with Detective Tinker. Finally, Deputy

Roden indicated that after he transported the defendants, he was done with the investigation.


**LAW**

A defendant may not be "compelled in any criminal case to be a witness against

himself." U.S. Const. Amend V. The Supreme Court held in Miranda v. Arizona, 384 U.S. 436,

478-79 (1966), that a suspect subject to custodial interrogation must first be given notice of his or

her right against self-incrimination and that statements obtained during such custodial interrogation

in violation of this Miranda rule may not be admitted for certain purposes in a criminal trial.

However, the obligation to administer Miranda warnings to suspects only arises if there has been

"such a restriction on a person's freedom as to render him 'in custody'." Oregon v. Mathiason, 429

U.S. 492, 495 (1977) (per curiam).

In the recent case of United States v. Swanson, 341 F.3d 524 (6th Cir. 2003), the Sixth

Circuit stated:

> In determining whether a defendant was subject to custodial interrogation we
> look to the totality of the circumstances "to determine 'how a reasonable man in the
> suspect's position would have understood the situation.'" [United States v.] Salvo,
> 133 F.3d [943] 948 [(6th Cir. 1998) (omitting internal cites)]. The "ultimate inquiry
> is simply whether there is a formal arrest or restraint on freedom of movement of the
> degree associated with a formal arrest." United States v. Knox, 839 F.2d 285, 291
> (6th Cir. 1988) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983).

Swanson, 341 F.3d at 528-29. In addition, the Sixth Circuit also noted that in Terry stop situations:

> An officer may stop a person upon reasonable suspicion of criminal activity. "The
> officer may ask the detainee a moderate number of questions to determine his
> identity and to try to obtain information confirming or dispelling the officer's
> suspicions. But the detainee is not obliged to respond. And, unless the encounter
> provides the officer with probable cause to arrest him, he must then be released. The

14

very nature of a <u>Terry</u> stop means that a detainee is not free to leave during the investigation, yet is not entitled to <u>Miranda</u> rights.

<u>Swanson</u>, 341 F.3d at 528 (citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439-41 (1984) and <u>United States v. Richardson</u>, 949 F.2d 851, 856 (6th Cir. 1991)).

As succinctly stated by the Sixth Circuit, the first pertinent question confronting this Court in determining whether the defendants' Fifth Amendment rights were violated is whether the defendants were arrested or their freedom of movement restrained to the degree associated with a formal arrest during the described investigatory detention.

The Sixth Circuit in <u>Swanson</u> also noted the factors for the Court to consider in determining this issue. These include first, whether a reasonable person in the defendant's position would have felt free to leave. <u>Id.</u> at 529. However, the Sixth Circuit specifically noted that in the context of a <u>Terry</u>-style investigatory detention, a person is not free to leave, at least temporarily. <u>Id.</u> In <u>Swanson</u>, the Court specifically noted that although defendant Swanson was not free to leave during the <u>Terry</u>-type questioning, the restraint exercised "never reached the level associated with 'formal arrest or a coercive context tantamount to custody'." <u>Id.</u> (quoting <u>Salvo</u>, 133 F.3d at 953). Accordingly, after applying a totality of the circumstances analysis, the Court concluded that the defendant Swanson was not subject to <u>custodial</u> <u>interrogation</u>. <u>Id.</u> at 531.

The other factors that the Sixth Circuit noted include the "purpose of the questioning," "whether the place of the questioning was hostile or coercive," the "length of the questioning," and "other indicia of custody," including whether the suspect was informed that the questioning was voluntary or that he was free to leave or to request officers to leave or whether the suspect possessed unrestrained freedom of movement during questioning, who initiated contact and

whether the suspect acquiesced to request to a answer questions. Id. at 529 (citing Salvo, 133 F.3d at 950).

Applying a totality of the circumstances analysis and the Swanson "factors" analysis, it appears to the undersigned that the detention in this case was more akin to a Terry stop than a custodial arrest. The officers, based on Ms. Richards' statements, did have reasonable and articulable suspicions that some criminal activity was afoot. In particular, they had received a call from an eyewitness complainant who indicated that she had seen Hispanic males go to the rear of an unattached trailer, with one of these males carrying bolt cutters, and she discovered that the seal had been cut off the rear of the trailer. She had reported this in a 911 call and Deputies Roden and Hooten had responded to that call. Officer Roden initially detained the defendants and asked a moderate number of questions in seeking to determine their identity and to obtain information confirming or dispelling suspicions regarding criminal activity. Although the defendants were not free to leave during this initial investigation and were temporarily detained, such detention and investigation did not rise to the level of a formal arrest, and thus they were not entitled to Miranda rights. It further appears that the Terry stop later escalated into a custodial arrest at or around the time that the defendants were placed in handcuffs and placed in the deputies' vehicles for transportation to the Sheriff's Department. Until that time, however, the Court finds that the restraint exercised did not reach the level associated with a formal arrest or coercive context to amount to custody. Accordingly, prior to that time Miranda rights would not have been required, and Deputy Roden's question to Leonardo Reyes regarding bolt cutters was not a question subject to Miranda warnings.

16

With regard to the other factors mentioned in <u>Swanson</u>, the Court notes that the "place" of the questioning was neither hostile nor coercive but rather was a public parking area. Furthermore, there were a very limited number of police, and Mr. Reyes was accompanied by his driving associates. Second, although seated on the curb, defendant Leonardo Reyes, was obviously permitted substantial freedom of movement as he was allowed to walk, apparently unrestrained to the rear of the trailer and then permitted to move over to his own tractor where he was allowed to obtain and secure bolt cutters and return them to Deputy Roden. Until the time he was placed in handcuffs and put in the car, although he was not free to leave, he was not physically restrained nor placed in handcuffs nor were any weapons drawn, nor was he told that he was under arrest, nor threatened with arrest.[1]

With regard to the factor associated with the "purpose" of the questioning, this Court finds that it is more akin to <u>Terry</u> stop questioning, in which the officers asked for identification and information seeking to confirm or dispel certain suspicions held by the officers. While the defendant must not be obligated to respond and while the officer's questioning must be limited in time, it appears the questioning of Leonardo Reyes occurred within minutes of the officers' arrival and/or the request to be seated. Furthermore, the questions asked were simple questions that related to the investigation and confirmation or dispelling of their suspicion regarding the defendants' involvement in this matter. Finally, with regard to the "length" of questioning factor, the Court finds that the questioning only consisted of a couple of questions over an extremely short period of time. It also appears that the defendant Leonardo Reyes initially acquiesced in the request to answer questions

---

[1] This would also apply to the other defendants, although there is no motion pending with regard to any statements made by those defendants.

and after answering the question then voluntarily went and obtained the bolt cutters without being asked to do so.

In the case of United States v. Protsman, No. 01-4294, 2003 WL 22025024, **3 (6th Cir. Aug. 26, 2003), the officers involved did not give Miranda warnings to the defendant and the issue there, as here, revolved around whether the questioning was considered part of "custodial interrogation." If it did, Miranda warnings were necessary and if not custodial, Miranda warnings were not required. Id. The Sixth Circuit noted in that case that custodial interrogation is defined as "'questioning initiated by law enforcement officers after a person has been taking into custody or otherwise deprived of his freedom of action in any significant way'." Id. (quoting Miranda, 384 U.S. at 444). The Sixth Circuit also noted that the "initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. Thus, 'the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation'." Id. (quoting Stansbury v. California, 511 U.S. 318, 323-24 (1994)). The Sixth Circuit also noted that it employs a "totality of circumstances" approach to determine if a suspect is in custody and that resolution of that question is not based on a single factor but on all the circumstances. Id. at **4. The court also noted that while one of the factors is whether a reasonable person in the defendant's position would have felt that he was under arrest or otherwise deprived of his freedom of action in a significant way, the 'ultimate inquiry is simply whether there is a formal arrest or restraint of freedom of movement of the degree associated with a formal arrest'." Id. (quoting Beheler, 463 U.S. at 1125.

Accordingly, it has commonly been stated that Miranda warnings are only required when there is custody and interrogation. While the above cases have dealt with the custody issue,

18

the issue of interrogation involves express questioning or its functional equivalent. Rhode Island v. Innis, 446 U.S. 291, 300 (1980). Volunteered statements are not considered to be part of express questioning. Id. Rather, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected" by the failure to giver the Miranda warnings. Miranda, 384 U.S. at 478; see also United States v. Cole, 315 F.3d 633, 636 (6th Cir. 2003).

In United States v. Mahan, 190 F.3d 416 (6th Cir. 1999), the Sixth Circuit rejected the defendant's claim that Miranda warning were required prior to defendant being questioned by the agent in issue. After going through the law regarding when a person is "in custody," the Sixth Circuit held the circumstances would not have lead a reasonable person to believe that he was under formal arrest or restrained in his freedom of movement to the degree associated with formal arrest. Id. at 421. The Sixth Circuit further stated "Miranda warnings are not required 'simply because . . . the questioned person is one whom the police suspect.'" Id. at 421-22 (quoting United States v. Warner, 971 F.2d 1189, 1201 (6th Cir. 1992)). In Mahan, the Sixth Circuit also pointed out that the agent never communicated any threat to arrest Mahan and that there was no show of force or brandishment of firearms nor was he placed in handcuffs or any other equipment ordinarily associated with formal arrest or custody. Id. at 422.

Furthermore, in Swanson supra it was noted that the test regarding whether a person is in custody for purposes of Miranda

> is not simply whether a reasonable person would have felt free to leave in the circumstances surrounding the interrogation. Although the "felt free to leave" inquiry may have been a factor for consideration, see [United States v.] Crossley, 224 F.3d [847] 861 [(6th Cir. 2000)]; Salvo, 133 F.3d at 949-50, the "ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." [United States v.] Knox, 839 F.2d [285,] 291 (quoting [Beheler, 463 U.S. at 1125] [(6th Cir. 1988)].

19

<u>Swanson</u>, 341 F.3d at 531.

Thus for analysis on the <u>Miranda</u> issue, the three relevant inquiries are:

1. Was the defendant Leonardo Reyes in custody;

2. Was he interrogated; and

3. Had the Fifth Amendment right against self-incrimination attached.

In this case, the Court finds that at the time he was questioned, Officer Roden's subjective opinion notwithstanding, Leonardo Reyes was not in custody. The Court finds that there was no formal arrest or restraint on his freedom of movement of the degree associated with a formal arrest until after his statement had been made and that such formal arrest did not occur until he was placed in handcuffs and put in the police car. The undersigned finds that he was interrogated, because he was asked express questions, but he was not subject to custodial interrogation because he was not "in custody" as that term is defined for Fifth Amendment purposes. Accordingly, the Court would answer the third inquiry in the negative and find that the Fifth Amendment right against self-incrimination had not attached.

Finally, the Court notes a recent, although unreported, case out of the Sixth Circuit, <u>United States v. Magana</u>, No. 02-5208, 2003 WL 21772144 (6th Cir. July 25, 2003), a case arising out of the Middle District of Tennessee, where the District Court had held that <u>Miranda</u> warnings were necessary because the agents had seized the defendant under the Fourth Amendment at the time that they had him accompany them for a line up. <u>Id.</u> at **1. The District Court had suppressed the evidentiary fruits from what it characterized as an illegal seizure. <u>Id.</u> The Sixth Circuit however reversed the District Court's ruling. <u>Id.</u> Because of the similarity in facts of that case to this case, this Court references the following quotes from that case:

20

Upon approaching, Agent Biggers saw two Hispanic males and one Caucasian male standing in the breezeway in front of the apartment. Agent Biggers saw that one of the Hispanic males - later identified as Defendant Magana - readily matched the physical description of "Andreas Mayer" that the postal clerk had given.

After "focusing his attention" on Defendant Magana and "casually approaching" the three individuals, Agent Biggers identified himself as a Secret Service Agent. Agent Biggers asked the three individuals if any of them lived in apartment 1603. Defendant Magana answered "yes." The Defendant stated that one of the other individuals present stayed there as well. The defendant also volunteered that his sister lives two apartments over in the same complex. After Agent Biggers asked Defendant Magana his name, the Defendant stated that it was "Antonio Rodriguez Magana, producing his driver's license for which Agent Biggers asked. . . . Agent Biggers asked the defendant whether he had ever been to the Franklin Post Office. Defendant Magana stated that he had been there about a month before. . . . . INS Agent Kinghorn asked the defendant if he would willingly go to the post office concerning "the package to see if he had been there." After Defendant Magana stated that he would go, he asked what it was about. Agent Biggers told the defendant that an individual had gone to the post office to try to obtain a package of illegal documents and gave that address. After Agent Biggers asked Defendant Magana whether he had been that individual, the Defendant stated that he had not. . . . .

The agents' conversation with Defendant Magana outside of the apartment, to which Agent Biggers testified as being casual, lasted about ten minutes. . . . .

Id. at **1-2.

The Magana court provided the following analysis of those circumstances:

As the District Court did not fully explain its reasoning in this case, we can only surmise how the district court arrived at the finding that Miranda warnings were required on the ground that, under the "free to leave" test, a Fourth Amendment "seizure" had occurred. Perhaps the District Court erroneously collapsed the Fourth Amendment and the Fifth Amendment analysis, without recognizing that the Fourth Amendment "seizure" doctrine is not interchangeable with the Fifth Amendment Miranda doctrine. See United States v. Salvo, 133 F.3d 943, 949 (6th Cir. 1998) (holding that the Fourth Amendment's "free to leave" test may only be one of several factors in the "custody" inquiry where the seizure is not a Terry stop, in which, by its very nature, an individual is not free to leave). A "seizure" under the Fourth Amendment does not necessarily comprise the "custody" necessary to trigger the Miranda doctrine under the Fifth Amendment. See Berkemer v. McCarty, 468 U.S. 420, 435-437, 441. (police roadside questioning of a motorist pursuant to a routine traffic stop is a Fourth Amendment "seizure" as the motorist would likely not feel free to not pull over or to leave the scene unilaterally; yet it is not necessarily "custody" under Miranda as it is "presumptively temporary and brief" and typically

21

"substantially less police-dominated"); <u>United States v. Brignoni-Ponce</u>, 423 U.S. 873, 787-880. . . (1975) ("The Fourth Amendment applies to all seizures of the person, including [<u>Terry</u> stops, which are] seizures that involve only brief detention short of a traditional arrest and thus do not require probable cause to be reasonable.). Moreover, for the <u>Miranda</u> doctrine to apply, <u>both</u> custody and interrogation must exist. . . . .

Here, although the district court found that <u>Miranda</u> warnings were required, the district court made no explicit finding of "custody" as such, or "interrogation" for <u>Miranda</u> purposes.

<u>Id.</u> at **3-4.  With regard to the reasonableness of the <u>Terry</u> stop and the potential <u>Miranda</u>

violation, the <u>Magana</u> court reasoned:

"If police have reasonable suspicion, grounded in specific and articulably facts, that a person they encounter was involved in or is wanted in connection with a completed felony," then the police may make a <u>Terry</u> stop to investigate that suspicion.  <u>United States v. Hensley</u>, 469 U.S. 221, 229. . . (1985).  Here, under all of the circumstances, a reasonable person may not have felt free to disregard the agents' questioning and leave the scene.  However, such a "seizure" did not exceed the legal bounds of a <u>Terry</u> investigative stop.

Here, upon encountering Defendant Magana outside the apartment, the agents objectively had reasonable suspicion, grounded in specific and articulable facts, that the Defendant had been the individual who had identified himself as "Andreas Mayer" and inquired about the package containing the illegal documents.  The defendant had matched the physical description of "Andreas Mayer" in that he was an Hispanic male with dark, bushy hair and a slender build and was standing outside the apartment that "Andreas Mayer" had indicated for the package's delivery.

Second, the government must show that the police used the "least intrusive [investigative] means reasonably available to dispel . . . [their] suspicion in a short period of time" to demonstrate that a <u>Terry</u> stop was reasonable.  <u>Bueno,</u> 21 F.3d at 125.  This concerns that "length of the investigative stop," not "whether the police had a less intrusive means to verify their suspicions <u>before</u> stopping" the individual.  <u>Sokolow</u>, 490 U.S. at 11. . .  In other words, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."  <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983).  A <u>Terry</u> investigative stop may not entail "means that approach the condition of arrest."  <u>Id.</u> at 499.  Thus, when an investigative detention-even one for which reasonable suspicion exists- "occurs over an unreasonable period of time or under unreasonable circumstances," it becomes an arrest.  <u>Avery,</u> 137 F.3d at 349.

Here, the investigative stop did not mature into a constructive arrest as it entailed neither an unreasonable length of time nor unreasonable circumstances.  During the <u>Terry</u> stop, which lasted only ten minutes, the agents asked Defendant Magana only those questions which were pertinent to their investigation of the post office inquiry.

See United States v. Knox, 839 F.2d 285 (6th Cir. 1988) (upholding an investigative detention that might have lasted up to 30 minutes). This reveals that the agents diligently "pursue[d] a means of investigation likely to confirm or dispel their suspicions quickly." Avery, 137 F.3d at 349. The agents neither physically touched nor handcuffed the Defendant until after they formally arrested him at the post office. . . . [E]ven a visible holstered firearm is "unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." United States v. Drayton, 530 U.S. 194, 204-205 (2002). . . .

Moreover, the presence of two of Defendant Magana's companions while the agents questioned the Defendant reduced any intimidating effect resulting from the officers' frames.

The district court underscored that all three agents had "their attention focused upon" Defendant Magana "because he matched the postal clerk's description, and he lived in the apartment to which the package of illegal documents was addressed." Yet, the existence of such reasonable, articulable suspicion regarding an individual's criminal activity-which is necessary to justify a Terry stop-cannot automatically transform such a valid Terry stop into a de facto arrest; otherwise, every Terry stop, by its very nature, would be an arrest. C.f. Beckwith v. United States, 425 U.S. 341. . . . (1976) (holding that the focus of law enforcement's investigation was not being "in custody" so as to trigger Miranda).

Based on the preceding discussion, which demonstrates the weight, if any, each of these factors receive in the Fourth Amendment analysis, it is clear that these factors are insufficient in the aggregate to support a determination that the agents constructively arrested Defendant Magana while they questioned him outside of his apartment. Rather the agents acted pursuant to a valid Terry investigative stop. . . . .

In sum, the agents did not constructively arrest Defendant Magana while questioning him outside of his apartment but, rather, acted pursuant to a lawful Terry investigative detention. Thus, the Defendant was neither subject to a Fourth Amendment seizure requiring probable cause nor was he "in custody" for purposes of the Miranda doctrine while he was outside of the apartment. Defendant Magana voluntarily consented to accompany the agents from the apartment building to the post office for a show-up. Thus, we RESERVE the district court's suppression order.

Id. at **4-6, **9.

        For the same reasons, the undersigned finds that Deputy Roden and Deputy Hooten did not arrest or constructively arrest defendant Leonardo Reyes or the other defendants while Leonardo Reyes was questioned at or around the trailer in issue. The Court does not find that such an arrest occurred until such time as the defendants were placed in handcuffs and put in the police

23

cars for transport to the Sheriff's Department. Rather, the Court finds that the officers were acting pursuant to a lawful Terry stop and that the defendants were subject to a lawful and brief investigative detention. Thus, neither the defendant Leonardo Reyes nor the other defendants were subject to a Fifth Amendment seizure at the time of Leonardo Reyes' statement. Nor were they "in custody" at the time any statements were made for purposes of the Miranda doctrine. The undersigned would also find, alternatively, that even if they were in custody for Fifth Amendment purposes, defendant Leonardo Reyes' voluntary act of walking to this own tractor and taking out bolt cutters and handing them to Deputy Roden, without being asked to do so, constituted a voluntary act on his part. Accordingly, with regard to the defendants' request that the statements of defendant Leonardo Reyes be suppressed, the Court recommends that the Joint Motion to Suppress [Doc. 17] be **DENIED**.

## B. SEARCH WARRANT

The affidavit and application for a search warrant were exhibited at the hearing as Government Exhibit SH-2. They were signed by Detective Mike Tinker as the affiant. On the front page, Detective Tinker states that he has reason to believe that in Catoosa County, Georgia, on the property described, to wit the interior and exterior of the subject "1994 Freightliner Truck-Tractor, contents and cargo of vehicle" that there is now located certain instruments, articles, person(s) or things namely:

> Tools used in the commission of a crime (burglary, auto theft) documentation or records pertaining to the theft, transport, sales, purchase or facility of the theft, transport, sales or purchase of stolen vehicles or commercial cargo or persons involved. Any United States currency derived from or used for the purpose of theft, transport, sale or purchase of stolen vehicles or commercial cargo."

The application then cites certain Georgia statues supporting the claim that the above items are being possessed in violation of Georgia law.

With regard to the facts supporting the search warrant and the alleged establishment of probable cause that a crime has been or is being committed and that the described items are presently located in the described property, the application and affidavit state in full as follows:

> "On April 19, 2003, the Catoosa County Sheriff's officer responded to 2732 Interstate 75, southbound Welcome Center Ringgold Catoosa County, Georgia, to investigate a report of suspicious activity around a cargo trailer with no truck attached, parked at the rear of the Welcome Center. Louise Richards, a driver parked close by, observed a tractor-trailer arrive, unhook from a trailer and pull a short distance away. Upon returning to the parked trailers, three Hispanic males were observed around the 2001 Wabash National Trailer being Illinois registration T280266 and a Landstar logo on the trailer. Mrs. Richards observed one Hispanic male approach the rear of the trailer, she had observed was locked with a pair of bolt cutters. A time later, the Hispanic male returned to the aforementioned 1994 Freightliner tractor and placed the bolt cutters inside.
> Upon investigation, it was found that the 2001 Wabash National Trailer bearing Illinois registration T280266 had been reported stolen from Knox County, Tennessee. The trailer was recovered and impounded.
> Further investigation indicated a number of stolen loads of commercial products had been stolen with the trailers recovered missing their cargo in the Macon, Georgia area. The investigation revealed Minlo Worldwide contracted with Hewlett Packard to transport their products utilizing Landstar as the commercial carrier."

Based on this information, the Judge of the Magistrate Court of Catoosa County, Georgia, issued a search warrant stating that he was "satisfied that there is probable cause to believe that a crime is being committed, or has been committed, and that the property described above is presently located on the person, premises, or property described above."

In the search warrant, the item/property to be searched was described as

"the interior and exterior of a white 1994 Freightliner Truck-Tractor, contents and cargo of vehicle. The vehicle described as a white 1994 Freightliner Truck-Tractor, vehicle identification no. 1FUYDZYBXRP873706, bearing Florida registration A9960G. The registered owner of the vehicle being listed as Power Acceptance Corporation, 1525 NW 167 Street, Miami, Florida. Registered to Tran Navia, 4220 SW 21st Street, Broward, Florida 33317."

Handwritten thereafter was the following: "the vehicle located at 38 Candy Lane, Yates Wrecker Service." The items for which the Judge found probable cause to believe would be located in that vehicle were the same as those heretofore set forth and contained in the application.

In reviewing the application and affidavit, it appears that, at best, the Judge of the Magistrate County or Catoosa County, Georgia, had before him the following evidence:

1. That officers had been called to the Welcome Center on I-75 in Ringgold, Catoosa County, Georgia to investigate a report of suspicious activity around some cargo trailer that was unattached to a tractor;

2. That a Louise Richards had observed "another" tractor-trailer arrive and subsequently the tractor was unhooked from the trailer and pulled a short distance away. Then, three Hispanic males were seen around a 2001 Wabash National Trailer with a Landstar logo on it. Mrs. Richards also saw one Hispanic male approach the rear of "the trailer," she had observed was locked, with a pair of bolt cutters.

3. That Hispanic male thereafter placed the bolt cutters inside a 1994 Freightliner tractor.

4. Investigation revealed that a 2001 Wabash National Trailer had been reported stolen from Knox County, Tennessee.

5. Other stolen loads of commercial products had been stolen with trailers recovered missing their cargo in the Macon, Georgia area.

6. Some company known as a Minlo Worldwide contracted with Hewlett Packard to transport products utilizing Landstar as the commercial carrier.

This Court sits as a reviewing Court with regard to the review of the search warrant issued by the Judge of the Magistrate Court of Catoosa County, Tennessee. This review is not a de novo determination of probable cause but rather a determination of whether there is "substantial

26

evidence" in the record to support the Magistrate Judge's decision to issue the warrant. Massachusetts v. Upton, 466 U.S. 727, 728 (1984). Furthermore, a search warrant that has been issued by a Judicial Officer is entitled to "great deference" upon review of the judicial officer's determination of probable cause. United States v. Calloway, 116 F.3d 1129, 1132 (6th Cir.), cert. denied, 522 U.S. 925 (1997). The validity of this search warrant, although obtained by Georgia state police officers from a Georgia state court, is tested by the requirements of the Fourth Amendment of the United States Constitution and not by Georgia State law because the evidence is ultimately being used in a federal prosecution. United States v. Shields, 978 F.2d 943, 946 (6th Cir. 1992).

In determining the sufficiency of the search warrant affidavit, the Court is "concerned only with the statements of fact contained in the affidavit." United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); see also Whiteley v. Warden, 401 U.S. 560, 565 (1971). In reviewing the propriety of the search warrant, the Court considers "the evidence that the issuing magistrate had before him only 'to ensure that [he] ha[d] a substantial basis . . . for concluding that probable cause existed.'" United States v. Jones, 159 F.3d 969, 973 (6th Cir. 1998) (quoting Gates, 462 U.S. at 238-39) (alterations in original). This is known as a four-corners review.

Here, the name of the informant, Louise Richards, was disclosed to the Magistrate Judge. Where such name is disclosed, the information is considered to have greater reliability and is more likely to support a probable cause finding. This is because if the information were fabricated, it would subject a known person to criminal liability. United States v. Helton, 314 F.3d 812, 820 (6th Cir. 2003), see also Gates, 462 U.S. at 233. In such cases, it has been held that further corroboration is not required regarding the reliability of such an identified informant. United States v. Miller, 314 F.3d 265, 270 (6th Cir. 2002), cert. denied, 539 U.S. 908 (2003). Thus, with regard

27

to the issue of burglary[2] the naming of the informant/witness is not an impediment to the finding of probable cause despite the lack of additional information establishing reliability.

However, unlike the testimony provided at this Court at the suppression hearing, the record reveals no information being provided to the Magistrate Judge indicating that any burglary or attempted burglary or the cutting of a seal or a lock on the back of the trailer in issue had occurred. To the contrary, the only information provided to the Magistrate Judge in the application and affidavit, was to the effect that the named informant saw one Hispanic male approach the rear of the trailer, "she had observed was locked," with a pair of bolt cutters, and thereafter, he returned to the 1994 Freightliner and placed the bolt cutters inside. There is no indication that the trailer lock was ever cut or cut off, as was testified to at the suppression hearing.

"The probable cause requirement . . . is satisfied if the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." United States v. Besase, 521 F.2d 1306, 1307 (6th Cir. 1975) (emphasis added). "Probable cause exists when there is a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place'." United States v. Johnson, 351 F.3d 254, 258 (6th Cir. 2003) (emphasis added) (quoting United States v. Greene, 250 F.3d 471, 479 (6th Cir. 2001).

Therefore, the first question for the Court is whether there was probable cause to believe that a crime had been committed and the second question is whether there was probable cause to believe that evidence of the crime would be found in the place to be searched. In regard

_____

[2]As discussed later, the informant, Ms. Richards, gives no information with regard to auto theft.

28

to the first question, the search warrant states that the Magistrate Judge was "satisfied that there is probable cause to believe a crime . . . has been committed . . . ."

In both the application and affidavit and in the search warrant, there are two different crimes and criminal offenses referenced. First, there is a reference to "burglary" and "possession of tools for commission of a crime" and "criminal attempt of burglary." Second, there are references to "auto theft" and "theft by receiving stolen property" and "theft by receiving stolen property in another state." A review of the affidavit and application, however, clearly establishes that the information from the informant, Ms. Richards, relates only to the criminal offenses of burglary or attempted burglary and that an "investigation" and "a further investigation" relates to the auto theft crime regarding the stolen trailer.

The questions for this Court to decide in determing if there is substantial evidence in the record to support the issuance of this Search Warrant, consist of whether there was "substantial evidence"in the record to support the Georgia Magistrate Judge's determination that there was:

1.   Probable cause that the crime of burglary or attempted burglary had been committed;

2.   Probable cause that the crime of auto theft or theft by receiving stolen property had been committed;

3.   Probable cause to believe that evidence of the crime of burglary or attempted burglary would be found in the freightliner truck/tractor to be searched;

4.   Probable cause to believe that evidence of auto theft or receiving stolen property would be found in the Freightliner truck/tractor to be searched.

With regard to the first question, the Court finds that there is not substantial evidence in the record to support the Magistrate Judge's determination that there was probable cause to

believe that the crime of burglary or attempted burglary or any other crime had been committed. There is evidence that a Hispanic male approached the rear of "the trailer,"[3] that Ms. Richards has "observed was locked," with a pair of bolt cutters and "a time later" placed the bolt cutters back inside the 1994 Freightliner tractor. However, there is no evidence, let alone "substantial evidence" to support the Magistrate Judge's determination that any crime was committed by the Hispanic male or anyone else. There is no evidence that the bolt cutters were ever used, or that any burglary, or any other crime actually occurred or was attempted. There is simply no evidence of any illegal activity having occurred with regard to the activity of "approaching" the rear of a trailer with bolt cutters. Specifically, there is no evidence that the rear of the trailer that Ms. Richards had "observed was locked," presumably sometime earlier, was not still locked. There is no evidence that this lock or seal was ever cut. While information came out at the suppression hearing that the lock/seal had been cut, there is no such evidence or information presented in the application or affidavit to the Magistrate Judge.[4]

Thus, on the basis of the Court's review of the record, the information before the Magistrate Judge indicated only that a male had gone near the rear of a trailer with bolt cutters and later returned. This is wholly insufficient to establish probable cause that any crime had been committed.

---

[3]The Court remains concerned that this generic description of "the trailer" does not constitute sufficient evidence that it is the Wabash National Trailer with the Landstar logo that is in issue. However, this concern is not the basis for the Court's ruling and will not be expounded upon.

[4]Had such evidence been included in the affidavit, which noted she had originally seen the trailer locked, then this Court would likely find that there was substantial evidence to support the Magistrate Judge's determination that there was probable cause to believe that a crime, i.e., at least attempted burglary, had been committed.

In answering the second question, I find that it is questionable whether there is sufficient evidence in the record to support the Magistrate Judge's determination that the crime of auto theft had occurred. The application and affidavit indicates that "upon investigation it was found that the 2001 Wabash National Trailer . . . had been reported stolen from Knox County, Tennessee." However, there is no indication as to what this "investigation" consisted of, or from where the information came. In short, there is little basis in the record regarding the reliability of such information. While the affidavit and application can be based on hearsay, provided there is some "indicia of reliability," there is no specific indication that this information came from law enforcement (for example, the Knox County Sheriff's Department, the FBI, NCIC records) or any other source indicating some "indicia" of reliability. Furthermore, while a Judge may rely on an officer's experience and his conclusions based on that experience, there is nothing in this record or affidavit to indicate the source of this information or that the investigation was based on or conducted by an experienced officer or that the information obtained was reliable from the standpoint of any experienced officer.

On the other hand, under a common sense approach and a totality of the circumstances approach, it would appear reasonable for the Magistrate Judge to believe that this investigation was conducted by the Catoosa County Sheriff's Department and further, that the specificity and detail, regarding the trailer and specifically from where it was reported stolen, would tend to provide some indicia of reliability regarding its accuracy. Although a close call, based on the "great deference" to be accorded the Magistrate Judge's decision on this issue, the Court finds that there was substantial evidence to support the Magistrate Judge's determination that the truck had been stolen and, thus, that the crime of auto theft had occurred.

31

With regard to the third question, and because of my findings in the answer to question number 1 above (that there was not substantial evidence to support a finding of probable cause that a burglary or attempted burglary occurred), the undersigned likewise finds that there was not substantial evidence in the record to believe that evidence of the crime of burglary or attempted burglary would be found in the Freightliner truck/tractor. Further, as observed in footnote 4, the Court notes that if additional information elicited at the suppression hearing regarding the seal or lock being found to be subsequently cut off had been contained in the affidavit, then the Court would likely have found substantial evidence to support a finding of probable cause that the crime of burglary or attempted burglary had occurred. If that had been the case, then the information in the affidavit regarding the Hispanic male's return to the Freightliner tractor and the placing of the bolt cutters inside such tractor would provide probable cause for the judge to believe that evidence of the crime would be found in that Freightliner tractor.[5]

---

[5]The Court feels constrained to note that at the suppression hearing, the testimony of Officer Roden was that <u>after</u> the bolt cutters had been returned to the tractor, and after Officer Roden's discussions with defendant Leonardo Reyes, that defendant Reyes retrieved the bolt cutters from the tractor and gave them to Officer Roden. Thus, it appears to the undersigned, that the information in the affidavit was at best incomplete and contained an error of omission regarding the subsequent removal of the bolt cutters. The government concedes this inaccuracy in the affidavit in its supplemental response [Doc. 32, p. 7]. I further find that disclosure of such information would have affected the finding of probable cause to believe that evidence of the crime would have been found in the tractor. However, no <u>Franks</u> hearing was conducted, nor was one required since no evidence was proffered regarding the requisite subjective threshold element that such omission be shown to have been made intentionally, recklessly or deliberately. Further, while this issue was not fully explored during the suppression hearing, nor fully briefed, the Court is concerned based on the evidence that it did hear, that the statements in the affidavit in support of the search warrant were misleading. I would further find that if the information from the hearing had been provided to the Magistrate Judge, then there would not have been probable cause to believe that evidence of a burglary or attempted burglary would be found in the Freightliner tractor. The bolt cutters were the only evidence that would support the search for "tools used in the commission of the crime (burglary . . . )" referenced in the search warrant and upon which probable cause could be based. If the bolt cutters were in the officer's possession, and not in the tractor, then there could be no probable cause

32

In answer to the fourth question and despite the fact that the Court has found that there was substantial evidence to support a probable cause finding that the Wabash National Trailer was stolen (see number 2 above), the Court nonetheless finds that there was not substantial evidence in the record to support the Magistrate Judge's determination that there was probable cause to believe that evidence of such theft or evidence of receiving stolen property would be found in the Freightliner truck/tractor that was authorized to be searched. The Court bases this result on a multi fold rationality.

First, while there may have been evidence that the truck was stolen, there is no evidence in the affidavit or application that these defendants were in any way involved in that theft or were going to steal this trailer from the Georgia Welcome Center. While it is the place and not the person that is primarily in issue in a search warrant, the fact of a lack of nexus with these defendants only highlights the lack of evidence that any "tools" allegedly used in the commission of the theft or any "documents" or other items relating to the theft would be found in this Freightliner truck/tractor which was associated with the defendants. In particular, the Court notes that there is no evidence in the application or affidavit that the defendants or the owner of the Freightliner truck/tractor, were ever in or from Knoxville, or that they or anyone associated with the Freightliner truck/tractor were involved in the theft or transportation of this truck/tractor from Knoxville, or transportation to Catoosa County, Georgia, nor is there any evidence that these defendants or anyone associated with the Freightliner truck/tractor intended to or had made any

---

to search for that which the affiant knew, or should have known, was not present. However, because the affiant was the Detective and not Officer Roden, whether he knew that fact, or whether the bolt cutters were returned to the tractor, were facts that did not come out at the suppression hearing.

33

effort to connect to that trailer for the purposes of theft or otherwise, or that the defendants or anyone associated with the Freightliner truck/tractor was in anyway connected with any trailer theft ring or plan. The subsequent reference to a "number of stolen loads of commercial products" being recovered "missing their cargo" in Macon, Georgia is of little or no significance to the undersigned inasmuch as there is no indication in this application or affidavit that this load included commercial products, nor is there any nexus stated between those other stolen loads and this reported theft, and this trailer was located in Ringgold, Georgia rather than Macon, Georgia, which is some 200 plus miles away.

Secondly, the bare evidence regarding the Hispanic male approaching the rear of the trailer with bolt cutters and then returning provides no evidence or support for a probable cause finding that "tools used in the commission of a crime (. . . auto theft), documentation or records pertaining to the theft, transport . . ." would be found in the Freightliner tractor. Not only is there an absence of any nexus between the Hispanic male(s) and the stolen truck, but there is a complete absence of any basis, let alone probable cause, to believe that the listed items would be located in the Freightliner tractor. Nor is there any information provided to establish that bolt cutters are a tool used in the commission of auto theft. Finally, there is no information or facts establishing that the other items to be searched for would be likely to be found in the Freightliner tractor.

Third, there is no information or facts, unlike at the suppression hearing, to indicate that these Hispanic males had actually driven or arrived in the 1994 Freightliner tractor. The affidavit simply says that Ms. Richards observed "another tractor-trailer arrive, unhook from a trailer, and pull a short distance away." There is no indication that the described "another" tractor/trailer was the 1994 Freightliner to be searched. The only arguable connection or nexus

34

between the two is the fact that the one Hispanic male returned to the "aforementioned"[6] 1994 Freightliner tractor and placed the bolt cutters inside.  Nor is there any information or statements by any experienced officer or otherwise to establish even a fair probability that "documentation or records" or "U.S. currency" related to the theft of a trailer would be located in the specific 1994 Freightliner to be searched.

Finally, the government, in its supplemental brief, raises for the first time the "good faith exception set forth in United States v. Leon, 468 U.S. 897, 926 (1984)."  In its brief, the government refers to the good faith of Detective Tinker and his reliance on the warrant.  However, it was not clear to the undersigned that he executed the search warrant.  Further, because he did not testify, it is unclear whether he or any other "executing officer" was acting in good faith in executing the search warrant, particularly in light of the fact that the bolt cutters were known (at least to Deputies Roden and Hooten) to not be in the tractor (see footnote 5).  Further, because the search warrant was not obtained until two days after the arrest, it is difficult for the undersigned to fathom that Detective Tinker was not aware that the bolt cutters had been produced to Deputy Roden and were not in the tractor to be searched.

In Leon, the Supreme Court recognized that the deterrent effect of the judicially created exclusionary rule did not extend to situations in which an officer in objective good faith obtains a search warrant from a judge and acts within the scope of that warrant.  468 U.S. at 920.  "In the ordinary case, an officer cannot be expected to question the [judge's] probable-cause determination or his judgment that the form of a warrant is technically sufficient.  . . . .  Penalizing

---

[6]The Court also notes the only place the Freightliner is aforementioned is in a description of the vehicle to be searched.

the officer for the [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Id. at 921.

The fact that a judge has issued a warrant typically will establish that the officer has conducted the search pursuant to said warrant in good faith, but the officer's reliance upon the warrant must be objectively reasonable. Id. at 922. In other words, the good-faith inquiry turns upon "whether a reasonably well-trained officer would have known that the search was illegal despite the [judge's] authorization." Id. at 922 n.23. In creating this standard, the Supreme Court set out four situations in which suppression pursuant to the exclusionary rule applied despite the officer's reliance upon a judicially-issued search warrant: (1) "if the . . . judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth," (2) if the issuing judge "wholly abandoned his judicial role" requiring neutral detachment and, in essence, acted as "'an adjunct law enforcement officer,'" (3) if the "warrant [was] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" and (4) if "the warrant [is] so facially deficient–i.e., in failing to particularize the place to be searched or the things to be seized–that the executing officers cannot reasonably presume it to be valid." Id. at 923 (quoting Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 326-27 (1979) and Brown v. Illinois, 422 U.S. 590, 610-11 (1975) respectively).

In addressing these "situations," the Court finds that the Judge issuing the warrant was misled by information in the affidavit regarding the presence of the bolt cutters, but there is insufficient evidence to determine if Detective Tinker as the affiant knew the information was false or recklessly disregarded the truth. The Court also finds that the affidavit upon which the search

warrant was based was so lacking in indicia of probable cause that no reasonable officer would believe probable cause existed. While the Court does not find, based on the evidence provided, that the issuing judge "wholly abandoned his judicial role" regarding neutral detachment, the Court finds herein, and reiterates, that the affidavit upon which the search warrant was based should not have been deemed sufficient by a neutrally detached judge to issue a search warrant based on the same. As such, the Court finds that the government did not establish that the <u>Leon</u> good faith exception should apply in this case.

For the above stated reasons, the Court finds that despite having given great deference to the Magistrate Judge's determination of probable cause, the Court's review of the application, affidavit, and the search warrant indicates that there is not "substantial evidence" to support his finding of probable cause. As such, the Court finds that the search was improper and recommend that any evidence obtained in the search should be suppressed.

## CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing and after reviewing the relevant legal authorities, it is clear to the undersigned that any evidence obtained in the search should be suppressed. For the reasons set forth herein, it is **RECOMMENDED** that the defendants' Joint Motion to Suppress [**Doc. 15**] be **GRANTED IN PART** in that the evidence gained from the search of the 1994 Freightliner tractor be suppressed because the warrant authorizing the search of said tractor was not based upon probable cause. The

Court also **RECOMMENDS** that the Joint Motion to Suppress be **DENIED IN PART** with regard to the requested suppression of defendant Leonardo Reyes' oral statements because the Court has found no Miranda or Fifth Amendment violation occurred in relation to the statements at issue.[7]

Respectfully submitted,

__s/ C. Clifford Shirley, Jr.__
United States Magistrate Judge

---

[7]Any objections to this report and recommendation must be filed with the clerk of the court within ten (10) days of receipt of this notice. Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P. Failure to file objections within the specified time waives the right to appeal the district court's order. See Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).

38